# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## NORTHERN DIVISION

| | | |
|---|---|---|
| DUSTY BLACK o/b/o O.L., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | No. 2:14 CV 95 DDN |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM

This action is before the court for judicial review on the final decision of defendant Commissioner of Social Security denying the application of Dusty Black on behalf of her daughter, O.L., for disability insurance benefits under Sections 1602, and 1614(a)(3)(A) of the Social Security Act. The parties have consented to the exercise of plenary authority by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c) (Doc. 10). For the reasons set forth below, the decision of the Administrative Law Judge (ALJ) is reversed and remanded.

## I. BACKGROUND

Plaintiff O.L was born on June 22, 1998. Her mother filed an application for disability insurance benefits on her behalf on November 17, 2010. She alleged an onset date of November 17, 2010, asserting disability due to Attention Deficit Hyperactive Disorder (ADHD), Depressive Disorder, a learning disorder, and Post Traumatic Stress Disorder (PTSD). (Tr. 111, 114.) Plaintiff's claims were denied initially, and she requested a hearing before an ALJ. (Tr. 5, 9.)

On August 29, 2013, following a hearing, the ALJ issued a decision denying plaintiff's application. (Tr. 10.) The Appeals Council denied her request for review. (Tr. 13.) Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## II. MEDICAL AND OTHER HISTORY

Since October 16, 2008, O.L. has been in special education due to social behavioral problems caused by a previously diagnosed anxiety disorder. (Tr. 93.)

On November 10, 2008, O.L.'s school requested that Monica Robles, M.D., a psychiatrist, evaluate O.L. because she was displaying unusual behaviors, including a preoccupation with cats, underdeveloped social skills, lack of ability to maintain friendships, bullying other students, and constantly denying when she did something wrong. O.L.'s mother reported that O.L. had not had any friends in the last four years and that she was unable to concentrate at school because she was easily distracted. Dr. Robles diagnosed PTSD, Major Depressive Disorder without psychotic symptoms, and learning disabilities. Dr. Robles ruled out ADHD, and established a global assessment functioning (GAF)[1] score of 50.[2] (Tr. 280-88.)

O.L. saw Katarzyna Derlikiewics, M.D., from May 2009 to October 2012. At her first appointment, Dr. Derlikiewics indicated that O.L. struggled somewhat in school and was experiencing frequent depressive, self-hating, and angry thoughts. O.L reported frequent anxiety and hearing things that were not really there. Dr. Derlikiewics noted that O.L. would begin working on social skills with therapist Stacy Melton, LCSW, and start Lexapro, an antidepressant. (Tr. 364-65.)

On November 17, 2009, Dr. Derlikiewics indicated that O.L.'s mother had discontinued treatment since the last appointment. O.L. was experiencing constant problems with attention span, and the school was encouraging O.L.'s mother to continue treatment. O.L.'s problems included low self-esteem, frequent depressive thoughts, agitation, poor energy levels, trouble sleeping due to hearing voices at night, and issues with attention and concentration. Dr. Derlikiewics restarted Lexapro and started Clonidine, for ADHD. (Tr. 361-63.)

---

[1] A Global Assessment of Functioning (GAF) is the clinician's judgment of the individual's overall level of functioning, not including impairments due to physical or environmental limitations. American Psychiatrics Ass'n, Diagnostic and Statistical Manual of Mental Disorders 30-32 (4th Ed. Text Revision 2000) (DSM-IV-TR).

[2] A GAF score of 41-50 indicates "serious symptoms… or any serious impairment in social, occupational, or school functioning. Id.

Dr. Derlikiewics saw O.L. on December 9, 2009 and documented that she was experiencing some positive changes since starting medication, but still had low energy, no motivation, difficulty falling asleep, and was failing several classes.  (Tr. 359-60.)

On January 7, 2010, Dr. Derlikiewics reported that O.L.'s mother did not start O.L. in the recommended therapy because she believed O.L. was doing well, including having a higher energy level and decreased depressive behavior.  (Tr. 357-58.)

On January 8, 2010, O.L.'s mother reported to James Thornton, M.D., that the school made her send O.L. to a "shrink" for an autism evaluation, and also that the school said O.L. had Attention Deficit Disorder (ADD)[3] and depression.  O.L.'s mother further stated that O.L. did not understand people and had sometimes been acting like a cat, but had recently when her mother told her that she would be put in a "looney bin."  (Tr. 375.)

In February 2010, O.L.'s teachers, Marla Sparks and Kristy Marth, completed a teacher questionnaire on behalf of O.L.  They opined that O.L. had a slight problem functioning in the domains of Acquiring and Using Information; slight to serious problem functioning in the domain of Attending and Completing Tasks; no problem to a serious problem functioning in the domain of Interacting and Relating with Others; no problem in the domain of Moving About and Manipulating Objects; no problem to an obvious problem in the domain of Caring for Herself.  (Tr. 94-101.)

On February 8, 2010, Dr. Derlikiewics reported that O.L. was doing well.  (Tr. 354-56.)

On February 26, 2010, the school reported to O.L.'s mother that O.L. was exhibiting unusual behaviors, such as eating nonfood objects such as paper, pencils, and pens, and acting inappropriately in front of others, such as making obscene gestures.  O.L. was also failing to submit homework and stealing from classmates.  (Tr. 255-62.)

On March 8, 2010, Dr. Derlikiewics indicated that O.L.'s behavior continued to deteriorate over the past few weeks.  She showed poor motivation and attention.  She continued to eat non-edible objects, exhibited inappropriate laughing, and heard her father's voice at night.

---

[3] Plaintiff was diagnosed initially as having attention deficit hyperactivity disorder (ADHD). Attention deficit disorder (ADD) is used interchangeably throughout O.L.'s medical history as addressed by different physicians.  However, "ADD" is now an obsolete term.  It is instead referred to as ADHD.  Psychiatric Ass'n., <u>Diagnostic and Statistical Manual of Mental Disorders V</u>. 59 (5th Ed. 2013).

O.L. had also falsely reported to the school that a man had broken into her house and raped her. (Tr. 351-53.)

On April 15, 2010, Dr. Derlikiewics reported that O.L. had been doing very well for the past month with the exception of difficulty concentrating in the afternoon. (Tr. 345-47.)

On July 23, 2010, Dr. Derlikiewics reported that O.L. was feeling fatigued and had not been doing very well over the past several weeks, including worsened depression. (Tr. 342-43.)

On August 25, 2010, O.L. struck another girl, committing third degree assault. On August 29, 2010, O.L. stole property from a neighbor, committing a Class A misdemeanor. (Tr. 91.)

On August 30, 2010, O.L. received a neuropsychological evaluation by Kourtney Christopher, M.Ed., at the Center for Autism and Neurodevelopment Disorders. The evaluation indicated average results in intellect, and below average results in daily living and adaptive skills, due to emotional and behavioral difficulties. The report also indicated O.L.'s greatest difficulties were in socialization and communication, and that O.L.'s social and academic difficulties were likely due to ADHD. Further, her anxiety, depression, and emotional difficulties could have been negatively affecting her ability to attend to and complete her schoolwork. (Tr. 296-309.)

On September 23, 2010, Dr. Derlikiewics noted that O.L. was experiencing mood swings, frustration, and depression upon increase of Lexapro, and was frequently throwing up. A Department of Family Services (DFS) worker accompanied O.L. to this appointment because she was stealing from classmates and fighting others. The DFS worker indicated that "the mother has poor insight and great difficulty in acknowledging extrinsic factors causing problems for O.L." (Tr. 340-41.)

On October 7, 2010, O.L. was issued a well-child exam by the Missouri Department of Social Services. Her medications included Adderall, for ADHD; Lexapro; Abilify, an antipsychotic; and Clonidine. (Tr. 372.)

October 8, 2010 correspondence by the Missouri Department of Social Services acknowledged that O.L.'s mother had completed an in-home services program that was put in place because O.L. had been seen in a dumpster, fought a girl upon encouragement by her mother, and had also stolen property from a neighbor. (Tr. 199.)

On October 12, 2010, O.L.'s mother reported to Dr. Thornton that O.L. was frequently dizzy. She underwent an EKG which was normal. Dr. Thornton thought her dizziness was from the increased Lexapro and referred O.L.'s mother to Dr. Derlikiewics to discuss it. (Tr. 369.)

On October 13, 2010, Dr. Derlikiewics reported that O.L. was taking her Lexapro at night instead of during the day. This change came after O.L. experienced a fainting spell at school the preceding Monday. O.L reported an increase in emotions, and was crying frequently, but was no longer feeling blunted as she previously had. (Tr. 338-39.)

An Individual Education Plan (IEP) meeting was held October 22, 2010 in which it was decided that O.L. qualified for special education due to emotional disturbance. The report indicated that O.L. did not benefit from direction instruction in large groups and that she was better off in a small group. It also stated she suffered impaired interactions with peers and lacked social relationships. (Tr. 75-79, 310-22.)

On October 25, 2010, O.L. was made a ward of the state as a result of the August 25 assault charge. (Tr. 323-24.)

On November 16, 2010, O.L. met with Dr. Derlikiewics for medication management. His diagnoses included PTSD, Learning Disorder Not Otherwise Specified, Major Depressive Disorder, and ADHD, inattentive type. (Tr. 335-37.)

On November 23, 2010, the Missouri Department of Social Services issued a written service agreement that O.L. was to continue therapy for one month. (Tr. 200.)

On January 10, 2011, Dr. Derlikiewics reported that O.L. had not been doing well, suffering from depression, fatigue, lack of motivation, and increased sleeping and eating. He recommended an increase in Lexapro. (Tr. 549-50.)

On January 27, 2010, Dr. Derlikiewics indicated that O.L showed no improvement since the last visit. She was being bullied at school, and was subsequently bullying her brother at home. She was exhibiting physically and verbally abusive behavior at home and school. (Tr. 546-48.)

In February 2011, Joan Singer, Ph.D., reviewed O.L.'s file and conducted a Childhood Disability Evaluation on behalf of the Social Security Administration, concluding that O.L. did not meet a listing. (Tr. 21, 379-83.)

On February 9 and March 10, 2011, Dr. Derlikiewics reported that O.L. was doing much better at home and school. However, he was concerned about O.L.'s short attention span and constant fidgeting. She was able to focus better with increased Adderall. (Tr. 540-45.)

On May 5, 2011, Dr. Derlikiewics reported that O.L. had not been doing well at home or school. She reported feeling tired, preferred to isolate herself, and was experiencing anhedonia, or the loss of the ability to feel pleasure. He increased her Abilify, noting he would switch to her Zoloft if she showed no improvement. (Tr. 538-39.)

On July 19, 2011, Dr. Derlikiewics reported that the increased Abilify resulted in improvement in her depression and fatigue. She was still, however, struggling with short attention span and some insomnia. (Tr. 536-37.)

On September 14, 2011, Dr. Derlikiewics noted that O.L. was doing well at home and school. He noted that her attention span was improved with Adderall and refilled that prescription. (Tr. 533-35.)

On October 4, 2011, Dr. Derlikiewics indicated O.L. was doing well at home and school. Her mother asked that she begin therapy again to improve her social skills and learn how to better cope with her mood changes. (Tr. 530-32.)

On November 2, 2011, Dr. Derlikiewics reported that O.L. was doing well at home but was struggling with a lack of attention span at school and failing classes as she was spending more time in a regular education curriculum. (Tr. 528-29.)

On November 28, 2011, Dr. Derlikiewics indicated that O.L. began having suicidal thoughts two weeks earlier. She reported lack of motivation and fatigue. O.L.'s mother decided to discontinue O.L.'s Abilify. She reported that O.L. was doing better, although O.L. reported that her mood fluctuated throughout the day regardless of the Abilify. Dr. Derlikiewics encouraged O.L.'s mother to keep O.L.'s counseling appointment that week. (Tr. 525-27.)

On January 5, 2012, Dr. Derlikiewics reported that O.L. was doing better since discontinuing Abilify, but was still having problems with attention span. O.L.'s mother had missed the scheduled therapy appointment, but said she would go to the next one. (Tr. 523-24.)

On February 6, 2012, Dr. Derlikiewics reported that the family was moving. O.L. had to change schools and was unhappy about that. (Tr. 521-22.)

On March 15, 2012, Dr. Derlikiewics reported that O.L. was having a good experience at the new school and that she was placed in smaller classes. He noted that O.L. did not want to

take medication anymore, in which case her morning and lunch medications needed to be administered by the school. (Tr. 518-20.)

On March 20, 2012, O.L. had her initial assessment with social worker Debbie White. O.L. stated she was there because she wished she had more friends. Ms. White assigned a GAF score of 50, indicating "serious" symptoms. (Tr. 514-17.)

On April 5, 2012, Dr. Derlikiewics reported that O.L. had been doing well with consistent medication administration, although she had decreased appetite. (Tr. 512-13.)

On April 30, 2012, Dr. Derlikiewics indicated that O.L. had been doing well at home and school, although she was reporting intermittent sadness. O.L. was tolerating her medications but with decreased appetite. (Tr. 509-11.)

On June 12, 2012, O.L. saw Dr. Thornton for dizziness and feeling faint. Her mother had subsequently stopped all of her mental health medications. She had also lost weight. (Tr. 412-14.)

On June 18, 2012, Dr. Thornton saw O.L. for dizziness and reported no real changes. She reported a blacking out in one eye that Dr. Thornton believed was a one-time event. O.L. had not returned to see Dr. Derlikiewics because her mother felt she was currently emotionally stable. Her mother also thought O.L. might have diabetes although Dr. Thornton disagreed. (Tr. 405-9.)

On July 25, 2012, Dr. Derlikiewics reported that O.L. was doing well and had lost weight due to eating healthier. Her primary care physician was investigating why she was experiencing episodes of near syncope or fainting upon standing up. (Tr. 507-08.)

On September 11, 2012, O.L. was experiencing headaches, dizziness, and weight loss. Dr. Thornton further reported that O.L. consistently hid her face and that her mother had to force her to eat. He believed her dizziness might be due to anorexia and that was hiding her face due to psychosocial issues. (Tr. 394-400.)

On October 31, 2012, Dr. Derlikiewics indicated that O.L.'s mother had been missing appointments, purportedly as a result of work and transportation issues. Her mother was continuing to call for medication refills and was instructed that she would need to bring O.L. in for complete refills. In the meantime, the school reported that O.L. had not been receiving her Adderall and that she was behaving and looking oddly, reporting auditory hallucinations, and making suicidal statements. The school psychiatrist evaluated her and reported no immediate

danger. O.L'.s mother had stated initially that O.L'.s psychiatric medications improved with her hallucinations and depression. She also reported that Dr. Thornton believed O.L.'s psychiatric medications were to blame for the near fainting spells, which is why she unilaterally stopped O.L.'s medications. OL.'s mother, however, was still requesting medication refills without telling Dr. Derlikiewics that she had discontinued them. OL'.s mother stated she did not want to restart O.L. on any medications and that was changing psychiatrists. Her care was transferred to Maria Pimental-Yager, M.D., a psychiatrist. (Tr. 504-06.)

O.L. had a new patient visit with Dr. Yager on December 6, 2012. Dr. Yager reported that O.L. had been feeling sad, crying frequently, isolating herself, feeling unable to feel pleasure, and frequently feeling tired since being off her medications for two months. O.L.'s mother reported that although O.L. was having suicidal thoughts about a month ago, she had been feeling better since and was not as hyperactive. O.L.'s mother continued to supervise O.L. closely. She reported that O.L was earning mostly A's in her special education classes, with the exception of her regular education classes. While O.L.'s schoolwork was okay, she was still disorganized, misplaced things frequently, and forgetful in daily activities. O.L. also complained of hyper-vigilance; she felt like somebody was watching her or wanted to hurt her, and that she had been hearing voices and seeing shadows. Her father had inappropriately touched her when she was eight years old, and he was now in jail. Dr. Yager reported that O.L. witnessed her mother being beaten up a lot when she was six years old, and had seen her mother's boyfriend try to drown her mother. While O.L.'s mother had a history of marijuana and alcohol abuse, she had been drug and alcohol free for three months, except for a beer she had consumed that day. Dr. Yager's diagnosis included Major Depressive Disorder, PTSD, and a history of ADHD. She wanted to rule out social anxiety, and assigned a GAF score of 50. She restarted her on Lexapro. (Tr. 386-92.)

On January 7, 2013, Dr. Thornton reported that he had been unable to identify a specific cause for O.L.'s dizziness. He further reported, "[m]y hope is that mom will get her into counseling or for some psychosocial emotional screening." (Tr. 385.)

On February 5, 2013, Dr. Yager indicated that O.L.'s mother called to report that she had removed O.L. from all of her medications because she was fainting or feeling dizzy. (Tr. 384.)

On February 19, 2013, O.L. had a counseling appointment with Marilyn Sue Frankenbach, LCSW. O.L. stated that she thought the appointment was a waste of time and that

she did not want to be there. O.L. reported that she did not like art class, her only regular education class, because there were too many students in the class, which made her nervous. She reported that the other students laughed at her for being ugly. Ms. Frankenbach further reported that O.L. was not currently taking any medications. Ms. Frankenbach's diagnosis included Major Depressive Disorder, Anxiety, history of ADHD and a GAF score of 55, indicating "moderate" symptoms. Ms. Frankenbach encouraged O.L. and her mother to begin with family therapy sessions and work toward individual sessions. (Tr. 580.)

On February 26, 2013, O.L. was issued an attendance probation agreement by her school for poor attendance during the 2012-2013 academic year. (Tr. 523.)

On March 12, 2013, O.L. met with Ms. Frankenbach and discussed her difficulty with feeling withdrawn, sad, irritable, anxious, and worried. (Tr. 581.)

On March 28, 2013, O.L. met with Dr. Yager to discuss her medications and current experience. O.L. reported that she was sleeping well, feeling in a good mood, but still experiencing dizziness but not passing out. Dr. Yager assigned a GAF score of 56, noted that she was still hiding her face behind her hair, and increased her Zoloft. (Tr. 581.)

On April 25, 2013, Dr. Yager reported that O.L. continued to do well at home and school, experiencing no behavior problems, and that her mood and anxiety were under control. She still did not have many friends and continued to not eat in the school cafeteria. However, she could speak in front of the class. Dr. Yager noted she was not hiding her face behind her hair during this appointment and assigned a GAF score of 59-60. O.L. stated that she would be continuing with Ms. Frankenbach for counseling. (Tr. 581.) In May 2013, Dr. Yager assigned a GAF score of 55. (Tr. 20-21, 568.)

O.L. was hospitalized at Blessing Hospital from May 23-31, 2013, for cutting herself on her arms and legs for the past year. On May 25, she was assigned a GAF score of 30, indicating behavior that is considerably influenced by delusions or hallucinations, … serious impairment in communication or judgment, … inability to function in almost all areas." (Tr. 559-65.)

On June 7, 2013, Dr. Yager reported that O.L. had been doing well, including her eating and sleeping. O.L. reported that before her hospitalization, she began feeling suicidal after learning that her friend on Facebook had died from drowning. O.L. reported that since being released from the hospital, she was able to handle her feelings with coping mechanisms such as

breathing, screaming, counting, drawing, and talking to her aunt and grandmother.  He assigned a GAF score of 55.  (Tr. 567.)

On August 23, 2013, Dr. Yager noted that O.L. had been feeling depressed for the last two months, including experiencing moodiness, trouble sleeping, and extreme anxiety while out with other people.  She continued to experience dizziness.  Dr. Yager assigned a GAF score of 50.  (Tr. 589-92.)

**ALJ Hearing**

O.L. testified to the following at a hearing before an ALJ on June 13, 2013.  She was 14 years old and lived with her mother, grandmother, aunt, cousin, and brother.  She attends special education classes for all classes but art.  Her special education classes have a six-to-one student/ teacher ratio.  She gets extra help from a teacher that reads to her.  She is not assigned homework.  She understands that she has ADHD.  It makes her hyper and unable to sit still.  She has friends at school, but does not get together with them outside of school.  (Tr. 608-10.)

She sees a therapist, but does not think it has helped.  She takes Zoloft, which helps with her depression but does not alleviate it entirely.  She still gets sad at least once every two days.  She enjoys drawing, singing, and watching TV.  (Tr. 614-19.)

O.L.'s mother also testified to the following.  O.L. has been diagnosed with depression, behavioral issues, PTSD, and a learning disorder.  Id.  She takes an antidepressant and a mood stabilizer.  She was placed on these medications after being hospitalized for cutting herself.  She has been on and off these medications, and is now back on them.  (Tr. 631.)  O.L. was discharged early from the hospital because Medicaid would not provide coverage additional because she was no longer suicidal.  (Tr. 630-31.)

O.L.'s mother testified that O.L. is incapable of going anywhere on her own, except for the nearby gas station.  She has anxiety attacks and thinks people are following her.  She does all of O.L.'s grooming, including bathing, shaving, and taking care of her hygiene during menstrual cycles.  O.L. is afraid to use kitchen appliances to cook for herself, but can operate the microwave and the toaster oven.  (Tr. 636-42.)

### III.  DECISION OF THE ALJ

On August 29, 2013, the ALJ decided that O.L was not disabled.  (Tr. 13.)  The ALJ found that O.L. had the severe impairments of ADHD, Depressive Disorder, Learning Disorder, and PTSD.  However, the ALJ found that she did not meet the listing of emotional disturbance/mood disorder, because there was no evidence of a mood disorder characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome.  Id. Further, the ALJ found O.L. did not have an impairment or combination of impairments listed in or medically equal to one contained in the Listings, 20 C.F.R. part 404, subpart P, appendix 1. (Tr. 16-17.)

The ALJ next evaluated functional equivalence, finding "marked" limitations in interacting and relating to others; "less than marked" limitations in acquiring and using information, attending and completing tasks, and ability to care for herself; and, no limitation in moving about and manipulating objects.  Id.  The ALJ concluded that because O.L. had only one "marked" area of functioning, her impairments did not functionally equal the severity of the listings.  (Tr. 27.)

### IV.  GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and are supported by substantial evidence in the record as a whole.  Pate-Fires v. Astrue, 564. F.3d 935, 942 (8th Cir. 2009).  "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's decision."  Id.  As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently.  See Krogenmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

In determining whether a claimant under the age of eighteen is disabled, the ALJ undertakes a sequential three-step evaluation.  20 C.F.R. § 416.924(a).  The first three steps are to (1) inquire whether the claimant is engaged in substantial gainful activity, (2) decide whether the impairment or combination of impairments is severe, and (3) determine whether the claimant has an impairment or impairments that meet, medically equal, or functionally equal a listed

impairment.  Id.  A claimant will not be considered disabled unless she meets the requirements for each of these three steps.  Id.

If a child has a severe impairment or combination of impairments that does not meet or medically equal any Listing, the Commissioner will decide whether the claimant has limitations that "functionally equal the listings" of disabling conditions promulgated by the Commissioner. See 20 C.F.R. § 416.926a(a).  To functionally equal the listings, the impairment or impairments must be of listing-level severity.  Id.  In other words, to be entitled to benefits, the claimant's impairments must be in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain of functioning.  Id.; Hudson ex rel. Jones v. Barnhart, 345 F.3d 661, 665 (8th Cir. 2003).

There are six domains of functioning: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being.  20 C.F.R. §  416.926a(b)(1)(i)-(vi).  A child has a marked limitation in a domain if the impairment "interferes seriously" with the child's ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(2).  An extreme limitation "interferes very seriously" with the child's ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(3).

When evaluating a claimant's ability to function in each domain, the Commissioner asks for and considers information that will help to answer the following questions: What activities can the child perform?  What activities is the child unable to perform?  Which of the child's activities are limited or restricted compared to other age-equivalent children who do not have impairments?  Where does the child have difficulty with activities – at home, in childcare, at school, or in the community?  Does the child have difficulty independently initiating, sustaining, or completing activities?  What kind of help does the child need to do activities, how much help is needed, and how often is it needed?  20 C.F.R. § 416.926a(b)(2)(i)-(vi).

These questions are not, singularly, or as a whole, the only factors useful to determine whether or not a child has a "marked" or extreme limitation.  20 C.F.R. § 416.926a(e)(2), (4)(I). If applicable, test scores can be used in combination with other factors, observations, and evidence to determine the level of impairment.  Id.  "Marked" or "extreme" limitations as

defined by test scores are not automatically conclusive if additional evidence in the record shows a pattern of behavior inconsistent with these scores.  See 20 C.F.R. § 416.926a(e)(4).

<h1 style="text-align:center">V. DISCUSSION</h1>

Plaintiff argues that the ALJ erred in finding "less than marked" limitations in the domain of acquiring and using information, attending and completing tasks, and caring for herself.  She argues the ALJ erred in determining that when O.L. is taking her medication, she is "able to function reasonably well and her mood, sleep, and concentration improve."  This court agrees.

### 1.  Acquiring and Using Information

Plaintiff argues that the ALJ erred in finding "less than marked" limitations in the domain of acquiring and using information.  The court concludes substantial evidence does not support the ALJ's finding that O.L. has "less than marked" limitations in the domain of acquiring and using information.

The domain of acquiring and using information refers to how well a child learns and uses information.  See 20 C.F.R. § 416.926a(g).  Adolescents should be able to demonstrate what they have learned in academic assignments and to use what they have learned in daily living situations without assistance.  See 20 C.F.R. § 416.926a(g)(v).  Adolescents should also be able to express simple and complex ideas, use increasingly complex language, and apply these skills in practical ways that will help them enter the workplace after finishing school.  Id.

The ALJ's determination that O.L.'s impairments in this domain are "less than marked" is based primarily on a teacher evaluation, a state agency evaluation, and one GAF score.  It fails to mention much evidence that is contrary to these evaluations and GAF score.

An ALJ is not obliged to explain all the evidence in the record.  Craig v. Apfel, 212 F.3d 433, 436 (8th Cir. 2000).  Failure to reference a matter in the opinion on which she made her determination does not mean the ALJ failed to rely on the evidence.  However, this does not give an ALJ the opportunity to pick and choose only evidence in the record supporting her conclusion.  Taylor v. Barnhart, 333 F. Supp. 2d 846, 856 (E.D. Mo. 2004) (quoting Robinson v. Barnhart, 366 F.3d 1078, 1083 (10th Cir. 2004)) ("The ALJ is not entitled to pick and choose from a medical opinion, using only those parts that are favorable to a finding of non[-]disability.");  Marnell v. Barnhart, 253 F. Supp. 2d 1052, 1082 (N.D. Iowa 2003) ("The ALJ's

failure to substantiate his conclusions adequately constitutes error.")   As the Eighth Circuit noted:

> An ALJ may have considered and for valid reasons rejected the … evidence proffered…; but as [the ALJ] did not address these matters, [the court] is unable to determine whether any such rejection is based on substantial evidence. Initial determinations of fact and credibility are for the ALJ, and must be set out in the decision.

Jones v. Chater, 65 F.3d 102, 104 (8th Cir. 1995); see also Taylor 333 F.Supp. at 856.  In doing so, the ALJ will fulfill his duty to provide sufficient reasoning for his opinion so a fair and just determination can be made on review.)   See also Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984) ("Every conflict in the record [need not be] reconciled by the ALJ; the crucial factors in any determination must be set forth with sufficient specificity to enable [the reviewing court] to decide whether the determination is supported by substantial evidence.")

While there is some evidence that indicates "less than marked" limitation in this domain, there is considerable evidence that the ALJ fails to address.  In this case, the ALJ points to the February 2010 evaluation by O.L.'s teachers where only slight limitations were established with respect to this domain to the exclusion of other evidence in the record reaching opposite conclusions.  Plaintiff contends that this is inconsistent with O.L.'s recorded current instruction level which indicates that although O.L. was in the seventh grade she was functioning at a fifth grade reading level and fourth grade written language level.  Plaintiff argues that this inconsistency is one way to show a "marked" limitation, i.e., being "a standardized test score between two and three standard deviations below the norm for the test."  20 C.F.R. § 416.926a(e)(2).  In Taylor, the court found that the claimant's substantial deviation from placement to performance indicated that it was impractical to believe that an adolescent functioning two to three grade levels below her current grade was not experiencing functional deficiencies in the domain regarding ability to learn.  333 F.Supp.2d at 857.

Further, the ALJ points to the state agency evaluation completed by Dr. Singer, who found that O.L. had "less than marked" limitations in this domain.  This evaluation is not substantial evidence of less than marked limitations in this domain because the state agency evaluation does not cite additional record evidence demonstrating a "less than marked" limitation outside of the aforementioned teacher evaluation.  Accordingly, because the teacher evaluation

has been determined as inconsistent with the other record evidence available, the same can likewise be said for the state agency evaluation.

Finally, the ALJ gives great weight to the GAF score of 55 assessed by Dr. Yager, which suggests that O.L. "is not as limited as her mother alleged." (Tr. 21.) The ALJ, however, failed to mention that this score was only one of nine total scores assigned to O.L. by various treatment providers over the course of five years, of which less than half suggest that O.L. was functioning at an appropriate level. (Tr. 280-88, 11/10/08, GAF 50; Tr. 514-17, 3/20/12, GAF 50; Tr. 386-92, 12/6/12, GAF 50; Tr. 581, 3/28/13, GAF 55; Tr. 581, 4/25/13, GAF 59-60; Tr. 20, 21, 568, 5/13, GAF 55; Tr. 559-64, 565 5/28/13 GAF 30; Tr. 567, 6/7/13 GAF 55; Tr. 589-92, 8/23/13 GAF 50.) The ALJ failed to explain how she compared, contrasted, and dismissed the differences in O.L.'s GAF test scores, which indicate an improper determination of a lesser limitation in functioning. <u>Span ex rel. R.C. v. Barnhart</u>, 2004 WL 1535768, at *9 (E.D. Pa. May 21, 2004) (ALJ's determination of a claimant's level of function was not supported by substantial evidence because of the ALJ's failure to explain how he weighed and discounted the significance of the claimant's score). The ALJ failed to acknowledge that O.L.'s GAF scores were evenly split on functionality.

The ALJ also neglected to acknowledge the record evidence demonstrating that for years O.L had a "marked" limitation in this domain. This included the failure to address the standard set forth in SSR 09-1p which states:

> If a child needs a person, medication, treatment device, or structured, supportive setting to make his functioning possible or to improve the functioning, the child will not be as independent as same-age peers who do not have impairments. Such a child will have a limitation, even if he is functioning well with the help or support. The more help or support of any kind that a child receives beyond what would be expected for children the same age without impairments, the less independent the child is in functioning, and the more severe we will find the limitation to be.

SSR 09-1p. Other record evidence reaches the opposite conclusion than the opinions expressed in the teacher and state agency evaluations. As set forth in SSR 09-1p, a child receiving modified supportive settings, even though performing well within them, is considered to be lesser-functioning than peers her age, and the more support received indicates the severity of the limitation.

In this case, the record evidence shows that O.L. has been in special education for years. In eighth grade, she was spending 605 minutes per week in a special education classroom and was receiving co-teaching when in the regular classroom. She was receiving special education services in all subjects with exception of art. In ninth grade, she was spending 1350-1575 minutes per week in special education and a maximum of 225 minutes per week in a regular classroom. (Tr. 206.)

> O.L. receives accommodations in oral reading of assessments, gets more time to complete assessments, uses a calculator in math, and is tested in small groups for state testing. In general, O.L. has preferential seating, teacher provided notes, extended time to complete things, allowed multiple sessions to complete things, has tests read to her, uses a calculator, has directions given to her a variety of ways, is given oral cues/prompts, has an assignment notebook, is given positive reinforces, has repeated reviews and drills, has frequent reminder of rules, is checked often for understanding and review, is given extended time to give oral responses, and is allowed frequent breaks or variety in activities.

(Tr. 21, 222-23.)

The record evidence indicates that for years O.L. has received escorts with a caretaker to and from classes in different classrooms. It further indicates that while O.L. is doing well in her special education courses, she is failing art, her only regular education class, which had been her best and favorite subject. (Tr. 201-03.)

Upon review of the entire record, the court concludes there is a considerable amount of substantial evidence suggesting a marked limitation in this domain. In light of the record and the ALJ's failure to explain her reliance on certain evidence to the exclusion of contrary evidence, the court concludes substantial evidence on the record as a whole does not support the ALJ's position.

### 2.  Attending and Completing Tasks

Plaintiff argues that the ALJ erred in finding "less than marked" limitations in the domain of attending and completing tasks. The court concludes that substantial evidence does not support this finding.

The domain of completing tasks refers to how well a child is able to focus and maintain attention, and how well she is able to begin, carry through and finish activities, including the mental pace at which she performs activities and the ease of changing activities. 20 C.F.R. §

416.926a(h). Adolescents should be able to pay increasingly longer attention to presentations and discussions, maintain concentration while reading textbooks, and independently complete and plan long-range academic projects. Id. Adolescents should be able to organize their materials and plan to complete assignments, maintain concentration on tasks for extended periods of time, and to not distract peers or be distracted by them. 20 C.F.R. § 416.926a(h) and SSR 09-4p.

Similar to the domain of acquiring and using information, the ALJ does not cite relevant record support for her conclusion, nor does she reconcile her opinion with substantial evidence to the contrary. The record indicates O.L. exhibits severe problems at school. For instance, O.L.'s 2012 IEP states that she has "trouble focusing in the general education classroom," "has trouble focusing on work for a long period of time," "has issues with transitions and coping with sudden change in her life," and the "amount of individual attention required [by O.L.] disrupts [the] teachers ability to provide quality instruction to others." (Tr. 211, 225, 230.) Her seventh grade teacher noted that O.L. "seems to emotionally need close attention from staff." (Tr. 96.) There are also a number of notes from O.L.'s teachers addressing O.L.'s failure to turn in assignments resulting in her continued failure of multiple classes. (Tr. 255-62.) The record therefore presents a substantial amount of evidence that the ALJ failed to acknowledge.

The ALJ gives great weight to the state agency evaluation by Dr. Singer. Dr. Singer's report indicates that within this domain, O.L.'s teacher "reports a serious problem with organizing own things or school materials. Teacher also indicates an obvious problem with focusing long enough to finish assigned activity or task, carrying out multistep instructions, completing class/homework assignments and completing work accurately without careless mistakes. These problems are noted to occur weekly." (Tr. 380.) While Dr. Singer categorizes the above observations in the "less than marked" option, when viewed in light of the fact that O.L. is having these problems within the structure and environment provided to her through her IEP, it is apparent that the severity of her limitation is heightened. See SSR 09-1p.

The ALJ points to Dr. Yager's GAF score of 55 as indicating only a slight limitation in this domain. However, as explained in domain one, the ALJ fails to acknowledge the other eight GAF scores assigned over the years by O.L.'s treating physicians, of which less than half fall within the moderate functioning range. As previously mentioned, because this score is not consistent with the evidence that the ALJ failed to mention, it should not have been given great

weight in contrast with the other less-than-moderate-functioning scores, and does not substantially support the ALJ's conclusion.

As previously stated concerning domain one, it is error for the ALJ to fail to substantiate her findings and to not reference and explain her exclusion of contrary evidence. For these reasons, there is not substantial evidence on the record to support the ALJ's conclusion that O.L. has "less than marked" limitations in this domain.

### 3. Caring for Herself

Plaintiff argues that the ALJ erred in finding "less than marked" limitations in the domain of caring for herself. The court concludes substantial evidence does not support this finding by the ALJ.

The domain of caring for oneself considers how well a child maintains a healthy emotional and physical state, including how well a child satisfies her physical and emotional wants and needs in appropriate ways. This includes how the child copes with stress and changes in the environment and how well the child takes care of her own health, possessions, and living area. 20 C.F.R. § 416.926a(k); SSR 09-7p.

Similar to domains one and two, the ALJ ignores evidence in her determination that O.L. suffers "less than marked" limitations in this domain. First, the regulations specifically address self-injurious actions such as self-harm and suicide attempts in this domain. For example, "impaired ability in this area is manifested by failure to take care of these needs by self-injurious actions." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.00(C)(4)(a). Section 416.926a(iv) specifically lists examples of limitations within this domain, including "engages in self-injurious behavior (e.g. suicidal thoughts or actions, self-inflicted injury, or refusal to take medication) . . . "

Here, O.L. had exhibited all three of these specified examples of limitations over the past several years. She expressed suicidal thoughts, statements and ideations in November 2011, October and November 2012, and June 2013. (Tr. 386-92 504-06, 525-27, 567.) Additionally, she was hospitalized at Blessing Hospital from May 23-31, 2013 for cutting herself. These facts were not mentioned or weighed in the ALJ's opinion. As stated previously, the ALJ does not have the discretion to disregard contrary facts and reasoning in her decision.

As support for her decision, the ALJ again points to the February 2010 teacher questionnaire wherein O.L.'s teachers believed that that regarding caring for herself, O.L. had an obvious problem handling frustration appropriately, and only slight to no problem in all remaining areas. The ALJ continued, "although the claimant's mother alleged that the claimant has significant deficits in this area, the overall evidence, including mental status examination finding, does not support that the claimant's limitations are as significant as the mother alleged." (Tr. 26.) The ALJ fails to state why she discredited O.L.'s mother's allegations.

To support her conclusion, the ALJ again cites Dr. Singer's state agency evaluation and Dr. Yager's GAF score of 55. As previously mentioned, this evaluation is insufficient to support a "less than marked" limitation in this domain as the evaluation references no further evidence that points to such a finding other than the teacher evaluation. Because the teacher evaluation is inconsistent with substantial evidence to the contrary, the evaluation is insufficient to stand as substantial evidence. Further, the GAF score, as previously mentioned, was not considered in light of the large number of contrary scores, and was therefore improperly afforded great weight.

The ALJ further fails to explain her decision to disregard the kinds of limitations mentioned in section 416.926a. One such limitation, section 416.926a(i), exists where the adolescent "continues to place non-nutritive or inedible objects in the mouth (e.g., dirt, chalk)." The record evidence indicates that O.L. engaged in such behavior in 2010, including eating pens, pencils, rubber bands, and lead. (Tr. 75-79, 255-62, 310-22, 351-53.) Another such limitation, section 416.926a(iii), exists where the adolescent "does not feed, dress, toilet, or bathe self age-appropriately." The record includes several statements of the mother's concerns and difficulties with O.L.'s failure to take care of herself, including her still having to select O.L.'s clothing, and assist with bathing and hygiene. (Tr. 641-42.) O.L.'s mother had O.L. placed on birth control because she was not maintaining her hygiene during her menstrual cycles. (Tr. 512-13.)

Finally, the ALJ does not acknowledge the limitation described in section 416.926a(vii), where the adolescent "has disturbances in eating or sleeping patterns." The record evidence shows O.L.'s inconsistent sleeping patterns, specifically in November and December 2009, January 2011, July 2011, November 2011, December 2012, and August 2013. (Tr. 361-63, 386-92, 525-27, 533-35, 549-50, 589-92.) Moreover, O.L.'s inconsistent eating patterns and weight fluctuations are documented in January 2011, April 2012, June and July 2012, September 2012, and June 2013. (Tr. 394-400, 412-14, 507-08, 512-13, 549-50, 567.) The record evidence

further showed that Dr. Thornton questioned whether she may have anorexia because she was experiencing dizziness and not eating or drinking well. (Tr. 394-400.) Dr. Yager also noted that O.L. had lost 55 pounds during in December 2012. (Tr. 386-92.) Such evidence is not discussed by the ALJ.

Because the ALJ fails to explain any rejection of the aforementioned facts and testimony that support a conclusion contrary to her decision, the ALJ's determination that the claimant suffers a "less than marked" limitation in this domain is not supported by substantial evidence.

### 4. Ability to Function Reasonably Well When Taking Medication

Plaintiff argues that the ALJ erred in finding that, when O.L. is complaint with medication she is able to function reasonably well, and her mood, sleep and concentration improve. (Tr. 19.) The court concludes substantial evidence does not support this ALJ finding.

Similar to the above three domains, the ALJ fails to indicate consideration of the substantial evidence contrary to her conclusion. In support, plaintiff cites SSR 09-7p, which states "[w]e do not consider a child fully responsible for failing to follow prescribed treatment." It further states "we must consider whether there is a "good reason" for the failure to follow to prescribed treatment. For example, if the child's caregiver believes the side effects of treatment are unacceptable . . . we would find that there is a good reason for not following the prescribed treatment." SSR 09-7p.

The record indicates that, although O.L. experienced spikes in her increased ability to function adequately with changes and replacements of medications, these improvements were short-lived, and did not completely remedy her limitations. Such improvements were accompanied with substantial adverse side effects, such as dizziness that lead to episodes of near fainting. (Tr. 384, 412-14, 580-81, 631.) The dizziness had been reported to O.L.'s treating physicians by her mother and her school; they indicated a side effect that was not outweighed by the benefits of the medication. See T.M. v Astrue, No. 4:11-CV-766 CDP, 2012 WL 4092457, at *31 (E.D. Mo. Sept. 17, 2012) (parent of the child can make the decision that side effects of the medication are not outweighed by the inconsistent benefits of adhering to such treatment).

For these reasons, there is not substantial evidence in the record to support the ALJ's conclusion that when O.L. is complaint with medication she is able to function reasonably well and her mood, sleep and concentration improve.

## VI. CONCLUSION

      For the reasons set forth above, the court concludes that the decision of the ALJ is not supported by substantial evidence in the record as a whole and is not consistent with the Regulations and applicable law. The decision of the Commissioner of Social Security is reversed under Sentence Four of the Social Security Act and remanded to the Commissioner for further proceedings consistent with this opinion. An appropriate Judgment Order is issued herewith.

_____/S/ David D. Noce_____
**UNITED STATES MAGISTRATE JUDGE**

Signed on August 24, 2015.